United States District Court
Southern District of New York
--------------------------------------------------------x

Whalehaven Capital Fund, Ltd. and
Alpha Capital Anstalt,

                    Plaintiffs,

        v.

Radient Pharmaceuticals Corporation and
John Does 1-10,

                    Defendants.

--------------------------------------------------------x

Affirmation In Support Of
Motion For Preliminary
Injunction

     Konrad Ackermann hereby affirms under penalty of perjury under the laws of the United States of America:

     I am a director of Plaintiff Alpha Capital Anstalt ("Alpha Capital"). I submit this affirmation in support of Alpha Capital's motion for a preliminary injunction and preliminary declaratory relief:

     i) directing Defendant Radient Pharmaceutical Corporation ("RPC") immediately: a) to adjust downward to $0.0943 the Exercise Price of the warrant (the "Warrant") issued by RPC to Alpha Capital pursuant to the Securities Purchase Agreement dated November 30, 2009 (the "Securities Purchase Agreement"); and b) to increase to 12,332,407 the number of shares of RPC common stock for which the

Warrant may be exercised, subject to further reduction in the Exercise Price and

further increase in the number of shares for which the Warrant may be exercised,

all as provided by, and in accordance with, the terms of the Warrant and the

Securities Purchase Agreement; and

ii) directing RPC to reserve at least 12,332,407 shares of its common stock for issuance to

Alpha Capital upon its exercise of the Warrant, subject to reserving additional

shares, all as provided by, and in accordance with, the terms of the Warrant and

the Securities Purchase Agreement; and

iii)  restraining RPC from issuing any shares of its common stock until it has complied

with its obligation to reserve shares in accordance with its obligations under the

Warrant and the Securities Purchase Agreement.

RPC, as hereafter set forth, has undisputedly failed in its obligation to reduce the exercise

price of the Warrant to $0.0943, to increase to 12,332,407 the number of shares for which the

Warrant may be exercised and to reserve sufficient shares of common stock to deliver upon

exercise of the Warrant, in accordance with RPC's contractual obligations. Thus Alpha Capital

has an overwhelming likelihood of success on the merits of its claims.

Alpha Capital will suffer irreparable harm if the requested injunctive relief is not granted.

RPC has a negative net worth exceeding $10.5 million. It has reported a loss in the first nine

2

months of 2010 exceeding $38 million. It has current assets of under $2 million and current liabilities exceeding $34 million making it impossible for RPC to meets its obligations. Its own accountants have expressed substantial doubt about RPC's ability to continue as a going concern. Alpha Capital should not be compelled to run the substantial risk that RPC will be unable to respond to a damages award at the end of a lengthy litigation, particularly when RPC itself agreed, in order to obtain Alpha Capital's investment, that Alpha Capital would be entitled to injunctive relief to remedy RPC's breach of its agreement with Alpha Capital. I have personal knowledge of the matters set forth herein.

the parties

Alpha Capital, is a Liechtenstein corporation with its principal place of business in Balzers, Liechtenstein. Upon information and belief, RPC is a Delaware corporation with its principal place of business located at 2492 Walnut Avenue, Tustin, CA 92780. In both the Warrant and the Securities Purchase Agreement the parties agreed to the exclusive jurisdiction of the federal and state courts in New York in which to bring any lawsuits and that New York law governs.[1]

---

[1]See §5(e) of the Warrant and §5.9 of the Securities Purchase Agreement.

3

factual background

On or about November 30, 2009, Alpha Capital purchased 1,860,714 shares of RPC common stock (the "Shares") from RPC for $529,000 pursuant to the Securities Purchase Agreement (Exhibit A). In connection with such purchase, Alpha Capital also received a Warrant to purchase 930,357 shares of RPC common stock (Exhibit B) (The shares underlying the Warrant are hereafter referred to as the "Warrant Shares"). The Warrant contained an initial Exercise Price of $1.25 per share.

The terms of the Warrant and
the Securities Purchase Agreement

The Warrant contained a "ratchet down" provision whereby the Exercise Price would be adjusted downward, and the number of shares covered by the Warrant would be increased, upon the happening of certain events. That provision was important to Alpha Capital because it prevented dilution of the value of the Warrant for which Alpha Capital negotiated in order to make its investment. One of those events was RPC's future issuance of, or agreement to issue, shares at an <u>effective</u> price per share less than the then effective Exercise Price (initially set at $1.25). In such event, the Exercise Price of the Warrant would be reduced to the effective price per share of the new issuance.[2]

---

[2]Section 3(b) of the Warrant provides as follows: <u>Subsequent Equity Sales</u>. If the Company . . . at any time while this Warrant is outstanding, shall sell or grant any option to purchase, or sell or grant any right to reprice, or otherwise dispose of or issue . . . any Common Stock or Common Stock Equivalents entitling any Person to acquire shares of Common Stock, at an effective price per share less than the Exercise Price (such lower price, the "<u>Base Share Price</u>"

4

In the event the Exercise Price of the Warrant was reduced, the Warrant provided that the number of shares of common stock covered by the Warrant would increase. The Warrant provided (see footnote 2) that the aggregate Exercise Price payable by Alpha Capital in the event it exercised the entire Warrant - i.e., 930,357 initial shares times $1.25 initial Exercise Price per share = $1,162,946 - would remain the same, both before and after any decrease in the Exercise Price. Thus Alpha Capital retained the right to "invest" $1,162,946 in RPC through exercise of the Warrant, regardless of any decrease in the applicable Exercise Price.[3] The number of shares of common stock covered by the Warrant, however, would increase upon any decrease in the Exercise Price because the Exercise Price for each share would be lower. (By way of example, if the Exercise Price were reduced from $1.25 to $0.50, then Alpha Capital would have the right to acquire 2,325,892 Warrant Shares ($1,162,946 divided by $0.50) instead of the initial 930,357 Warrant Shares. If the Exercise Price were reduced to $0.10, then Alpha Capital would have the right to acquire 11,629,463 Warrant Shares.)

The Securities Purchase Agreement also obligated RPC to list the Shares and the Warrant Shares on the Trading Market where RPC stock was traded so that Alpha Capital could sell them

---

and such issuances collectively, a "<u>Dilutive Issuance</u>") . . . then, the Exercise Price shall be reduced and only reduced to equal the Base Share Price and the number of Warrant Shares issuable hereunder shall be increased such that the aggregate Exercise Price payable hereunder, after taking into account the decrease in the Exercise Price, shall be equal to the aggregate Exercise Price prior to such adjustment; <u>provided, however</u>, that until such date Shareholder Approval is obtained and deemed effective, no adjustment shall occur hereunder; <u>provided, further</u>, that upon Shareholder Approval, any adjustments that did not occur because of this proviso shall be immediately deemed effective."

[3]The Warrant contained a cashless exercise provision so that Alpha Capital need not make an actual cash investment in RPC to exercise the Warrant.

on the open market.[4] Because the number of Shares and Warrant Shares which RPC agreed to list

exceeded twenty percent of RPC's then outstanding shares, shareholder approval of the issuance

of the shares in excess of such 20% was required under NYSE AMEX rules in order to list the

Shares and Warrant Shares. RPC agreed in the Securities Purchase Agreement to obtain such

shareholder approval.[5] RPC agreed that it would recommend to its shareholders approval of such

share issuance.


**RPC triggers the ratchet down
provision of the Warrant**


      From March 22, 2010 through April 26, on four occasions, 2010, RPC issued Convertible

---

[4]RPC's separate agreement to register the Shares and the Warrant Shares is not involved
on this motion.

[5]Paragraph 4.10 of the Securities Purchase Agreement provides as follows: Listing of
Common Stock. The Company hereby agrees to use best efforts to maintain the listing or
quotation of the Common Stock on the Trading Market on which it is currently listed, and
concurrently with the Closing, the Company shall apply to list or quote all of the Shares and
Warrants Shares on such Trading Market and promptly secure the listing of all of the Shares and
Warrants Shares on such Trading Market. . . .  In addition, at the earliest meeting of shareholders
(which may also be at the annual meeting of shareholders) the Company shall seek to obtain
Shareholder Approval, with the recommendation of the Company's Board of Directors that such
proposal be approved, and the company shall solicit proxies from its shareholders in connection
therewith in the same manner as all other management proposals in the proxy statement and all
management-appointed proxy holders shall vote their proxies in favor of such a proposal.

"Shareholder Approval" is defined in section 1.1 of the Securities Purchase Agreement as
follows: "Shareholder Approval" means such approval as may be required by the applicable rules
and regulations of the NYSE AMEX (or any successor entity) for the shareholders of the
Company with respect to the transactions contemplated by the Transaction Documents, including
the issuance of all of the Shares and Warrants Shares in excess of 19.99% of the issued and
outstanding Common Stock on the Closing Date.

Promissory Notes (the "Notes") to various investors.[6] Those Notes were convertible, in whole in or part, into shares of RPC common stock at a price of $0.28 per share.[7] Thus because the Notes gave the holders thereof the ability to acquire shares of RPC common stock at a price lower than $1.25 per share, the issuance of the Notes triggered the ratchet down provisions of the Warrant. Although $0.28 was the nominal price at which a Note holder could obtain shares of RPC common stock upon conversion of the Notes, the _effective_ price at which a Note holder could obtain RPC common stock, which is the relevant price for purposes of the ratchet down calculation under the Warrant, was actually $0.0943, as hereafter set forth.

The Notes were not issued at par. As set forth in RPC's 10-Q for the quarter ended September 30, 2010, which was filed on November 22, 2010 (Exhibit E), the Notes initially had an aggregate face amount of $11,057,465. The Note purchasers, however, paid only $6,455,000 to purchase the Notes, a discount of $4,602,365. Because of various defaults by RPC, as set forth in the 10-Q, RPC twice increased the face amount of the Notes, without increasing the price paid

---

[6]A copy of the Note issued on March 22, 2010 is annexed hereto as Exhibit C. The Notes issued on April 8, 2010, April 13, 2010 and April 26, 2010 are identical to the March 22, 2010 Note except for the amounts and the names of the payees.

[7]The number of shares of common stock into which the Notes are convertible is determined by dividing the Conversion Amount (i.e., the amount of the Notes which the holder wants to convert into common stock) by the greater of the Conversion Price at the time of conversion (defined as 80% of the Volume Weighted Average Price ("VWAP") for the five trading days preceding the conversion) or the Floor Price (defined as $0.28) (Exhibit C, paras. 1, 3(a) and 4). As is set forth in Exhibit D annexed hereto, 80% of the VWAP for RPC stock has been less than $0.28 since the Notes were issued. Thus the $0.28 Floor Price is the price at which any Note holder had the right to acquire RPC common stock by converting the Notes into common stock.

by the Note purchasers. After such increases, the Notes have a face amount of $18,362,927 (Exhibit F).

The Note purchasers, therefore, acquired every dollar of face amount of the Notes for $0.35 ($18,362,927 face amount of the Notes divided by $6,455,000, the amount paid to purchase the Notes). Every face amount dollar of the Notes used to convert into RPC common stock, therefore, cost the Note purchaser only $0.35. When converting any portion of the Notes into common stock, therefore, the Note purchaser paid an _effective_ price per share of only 35% of $0.28, or $0.0943. Under the "ratchet down" provisions of the Warrant, therefore, which reduced the Exercise Price of the Warrant to the effective price at which a subsequent Note purchaser could acquire RPC common stock, Alpha Capital's Exercise Price under the Warrant was reduced to $0.09843. Because the Exercise Price was reduced to $0.0943, the Warrant is now exercisable into 12,332,407 shares of RPC common stock ($1,162,946 representing the aggregate dollar amount required to exercise the entire Warrant divided by the new Exercise Price of $0.0943).

Alpha Capital requested RPC to honor the terms of the ratchet down provision and to acknowledge the new, lower Exercise Price of $0.0943 and that the Warrant now covered 12,332,407 shares of RPC common stock. RPC refused to do so.

RPC obtains shareholder approval

In a delayed attempt to comply with its contractual obligation to obtain Shareholder Approval, as required by the Securities Purchase Agreement since November 2009, RPC, on or about June 22, 2010, filed a preliminary Proxy Statement (Form 14a), which is the disclosure document pursuant to which RPC sought to solicit shareholder proxies for approval of the transaction with Alpha Capital under the Securities Purchase Agreement and for other shareholder resolutions (having nothing to do with the Securities Purchase Agreement). Alpha Capital requested that RPC make certain changes to the proposed resolution relating to their transaction because it did not properly reflect the transaction.

After negotiation, the parties agreed in writing on August 29, 2010 (Exhibit G) that the Exercise Price of the Warrant would be reduced to $0.28 and the Warrant would be extended to cover 7,114,585 shares of common stock. Alpha capital's agreement to the $0.28 Exercise Price represented a concession on Alpha Capital's part. RPC would present two resolutions to a shareholder vote: one would request shareholder approval to issue presently up to 12,576,842 shares (which included shares for Alpha Capital and Whalehaven) upon exercise of the Warrant at the reduced Exercise Price of $0.28; the second would request shareholder approval to issue in the future such number of shares as may be required to meet RPC's obligations under further implementation of the anti-dilution provisions of the Warrant. The agreement provided that if four or fewer proposals in the Proxy Statement did not pass (there were fourteen proposals being submitted for shareholder approval), then Alpha Capital was not thereafter bound by its

9

agreement regarding the $0.28 reduced Exercise Price or that the Warrant covered only 7,114,585 shares of common stock.

Pursuant to that agreement, RPC submitted resolutions 5 and 6 (out of a total of fourteen resolution) at the shareholders meeting held on December 3, 2010. (The entire Proxy Statement which includes all of the resolutions submitted for shareholder approval is annexed hereto as Exhibit H.) Resolution 5 was designed to obtain approval of the compromise reached by the parties with respect to the new Exercise Price of, and number of shares to be covered by, the Warrant. Resolution 6 was to designed to obtain shareholder approval for all shares which RPC was contractually obligated to deliver pursuant to the ratchet down provisions of the Warrant.

5.      **APPROVE AND RATIFY THE ISSUANCE OF SHARES OF COMMON STOCK UNDERLYING WARRANTS TO PUR-CHASE UP TO 10,932,199 SHARES OF COMMON STOCK BELOW THE GREATER OF A SHARE OF COMMON STOCK'S BOOK VALUE OR MARKET VALUE AT THE TIME OF ISSUANCE AND A REDUCTION IN THE EXER-CISE PRICE OF 1,644,643 PREVIOUSLY ISSUED WAR-RANTS**: A proposal to approve and ratify the issuance of shares of common stock underlying warrants to purchase up to 10,932,199 shares of our common stock, representing an additional approximate 23% of outstanding shares as of the date hereof, and the reduction of the warrant exercise price from $1.25 to $0.28 per share for warrants originally issued in connection with the private offering that we closed on November 30, 2009, pursuant to which we issued 3,289,285 shares of our common stock and warrants to purchase an aggregate of 1,644,643 shares of our common stock (the "Registered Direct 2009 Offering"). If this Proposal is approved, then the purchasers in the Registered Direct 2009 Offering will have received warrants to purchase a total of 12,576,842 shares of common stock at an exercise price of $0.28 per share, and the reduced per-share exercise price may be below the greater of a

share of our common stock's book value of its market value at the time of issuance;

6.    **APPROVE AND RATIFY THE RIGHT TO ISSUE ADDITIONAL SHARES OF COMMON STOCK AS MAY BE REQUIRED PURSUANT TO THE ANTI-DILUTION TERMS OF CERTAIN WARRANTS IN THE FUTURE IF SUCH AN ADJUSTMENT IS REQUIRED**: A proposal to approve and ratify management's right to issue, in the future, that number of additional shares of common stock upon exercise of the Registered Direct Offering Warrants as may be required upon further implementation of, and in accordance with, the anti-dilution adjustments set forth in the warrants, so that we will be able to comply with all of the anti-dilution rights granted in the warrant, if such adjustments should become necessary in the future. If this Proposal is approved. then the purchasers in the Registered Direct 2009 Offering may receive any number of additional warrants in the future if their anti-dilution results are triggered at a price per share that is below the greater of a share of our common stock's book or market value at the time of issuance.

The shareholders failed to approve proposal 5. The shareholders approved proposal 6 and all of the other proposals contained in the Proxy Statement (Exhibit I). Because proposal 5, which would have ratified the settlement reached between Alpha Capital and RPC, was the only one not to obtain shareholder approval, Alpha Capital informed RPC that it was no longer bound by the terms of the settlement (Exhibit J). As a result, after proposal 5 was not approved, RPC became obligated to reduce the Exercise Price of the Warrant to $0.0943 in accordance with the terms thereof (not in accordance with the settlement) and became further obligated to increase the number of shares covered by the Warrant to 12,332,407 in accordance with the terms of the Warrant (not in accordance with the settlement) and to issue those shares upon Alpha Capital's exercise of the Warrant. Alpha Capital exercised its Warrant on December 6, 2010 (Exhibit K).

11

Shareholder approval of proposal 6 at the December 3 meeting complies with the

definition of Shareholder Approval, set forth in the Securities Purchase Agreement:

> "Shareholder Approval" means such approval as may be required
> by the applicable rules and regulations of the NYSE AMEX (or
> any successor entity) for the shareholders of the Company with
> respect to the transactions contemplated by the Transaction
> Documents, including the issuance of all of the Shares and
> Warrants Shares in excess of 19.99% of the issued and outstanding
> Common Stock on the Closing Date.

The applicable NYSE AMEX rule regarding shareholder approval states as follows:

> 312.03 Shareholder Approval
>     Shareholder approval is a prerequisite to issuing securities
> in the following situations: . . .
> (c) Shareholder approval is required prior to the issuance of
> common stock, or of securities convertible into or exercisable for
> common stock, in any transaction or series of related transactions
> if:
> (1) the common stock has, or will have upon issuance, voting
> power equal to or in excess of 20 percent of the voting power
> outstanding before the issuance of such stock or of securities
> convertible into or exercisable for common stock; or
> (2) the number of shares of common stock to be issued is, or will
> be upon issuance, equal to or in excess of 20 percent of the number
> of shares of common stock outstanding before the issuance of the
> common stock or of securities convertible into or exercisable for
> common stock.

Proposal 6 specifically authorized RPC to issue, "in the future, that number of additional

shares of common stock upon exercise of the Registered Direct Offering Warrants [the Warrant]

as may be required upon further implementation of, and in accordance with, the anti-dilution

adjustments set forth in the warrants, so that we will be able to comply with all of the

anti-dilution rights granted in the warrant if such adjustments should become necessary in the future." As a result of the shareholders' failure to approve proposal 5, the adjustment to the Warrant in accordance with its terms became necessary. There is no limit on the number of shares of common stock authorized by the shareholders to comply with the terms of the Warrant. Thus the shareholders approved issuance of whatever number of shares of common stock were necessary to comply with RPC's obligations to Alpha Capital, which exceeded 20% of RPC's outstanding shares (together with Whalehaven).[8]

RPC's contract obligation to reduce the Exercise Price of the Warrant to $0.0943 and to increase the number of shares covered by the Warrant to 12,332,407 is clear from the Warrant, the Securities Purchase Agreement and the undisputed issuance by RPC of Notes convertible into shares of common stock at an effective price of $0.0943. RPC's shareholders approved issuance of whatever number of shares were required to comply with its obligations under the Warrant. Alpha Capital has an overwhelming likelihood of success on the merits of its claims.

---

[8]RPC takes the position that because proposal 5 was rejected, the shareholders did not approve issuance to Alpha Capital of any shares under the Warrant. Proposal 6, according to RPC, authorizes issuance of shares only if there is a future dilutive issuance (Exhibit L). Even if that position is correct (which it is not), Section 3(b) provides for a ratchet down both upon RPC's agreement to issue stock at a lower price than the current Exercise Price and upon RPC's actual issuance of stock at such lower price. The shareholders at the December 3 meeting, approved the issuance of stock to the Note holders at $0.28 per share and, upon information and belief, shares were thereafter, or will shortly be, issued to Note holders at the $0.28 price. Thus, even under RPC's interpretation of the shareholder resolutions, a future dilutive event has occurred (or will shortly occur) after the December 3 meeting - i.e., the actual issuance of the shares at the $0.28 price to the Note holders. In any event, contrary to RPC's contention, Proposal 6 does not by its terms require the dilutive event to occur in the future but simply requires the share issuance to be in the future. Any issuance of shares to Alpha Capital pursuant to any relief herein granted by the Court will be "in the future" and, in accordance with the terms of the resolution, "in further implementation" of the anti-dilution provisions of the Warrant.

Failure to reserve shares

RPC is obligated to reserve sufficient shares to meet its obligations under the Warrant. Thus para. 5(d) of the Warrant provides:

> The Company covenants that, during the period the Warrant is outstanding, it will reserve from its authorized and unissued Common Stock a sufficient number of shares to provide for the issuance of the Warrant Shares upon the exercise of any purchase rights under this Warrant.

As set forth herein, RPC is obligated to reserve at least 12,332,407 shares of its common stock to meet its current obligations to Alpha Capital to reserve shares, subject to further increase under the terms of the Warrant and Securities Purchase Agreement. RPC has not reserved any shares to comply with that obligation. Thus Alpha Capital has an overwhelming likelihood of success on its claim that RPC has failed to reserve shares in accordance with its contractual obligation.

RPC, pursuant to the other resolutions approved by the shareholders, will be issuing a significant number of shares to other individuals and entities. Unless the Court orders RPC to comply with its obligation to reserve shares for Alpha Capital and prevents RPC from issuing shares to others until it has complied with its obligation to reserve shares for Alpha Capital, there may well be no shares remaining with which RPC can meet its contract obligation to deliver shares upon Alpha Capital's exercise of the Warrant.

Irreparable harm

RPC agreed that Alpha Capital would be entitled to equitable relief in the event RPC failed to comply with its obligations under the Warrant. Thus paragraph 5(j) of the Warrant provides:

> Remedies:    The Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, will be entitled to specific performance of its rights under this Warrant. The Company agrees that monetary damages would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Warrant and hereby agrees to waive and not to assert the defense in any action for specific performance that a remedy at law would be adequate.[9]

Consistent with RPC's agreement, Alpha Capital will in fact suffer irreparable harm in the event the Court does not award the requested injunctive relief. RPC, by its own admission, is highly unlikely to be able to satisfy any ultimate award of damages. In its most recently filed annual financial statements for the quarter ended September 30, 2010 (Exhibit M), RPC reported a negative net worth exceeding $10.5 million. It has reported a loss in the first nine months of 2010 exceeding $38 million. It has current assets of under $2 million and current liabilities exceeding $34 million making it impossible for RPC to meets its obligations.

---

[9]Paragraph 5.15 of the Securities Purchase Agreement contains an identical provision with respect to all of the Transaction Documents.

Indeed, RPC's accountants have expressed substantial doubt about RPC's ability to

continue as a going concern. In the 10-Q filed November 22, 2010, the accountant stated (Exhibit

N):

> Going Concern
> The condensed consolidated financial statements have been prepared assuming the Company will continue as a going concern which contemplates, the realization of assets and satisfaction of liabilities in the normal course of business. The Company incurred losses from continuing operations of $38,420,688 and $10,799,937 for the nine months ended September 30, 2010 and 2009, respectively, and had an accumulated deficit or $90,859,241 at September 30, 2010. In addition, the Company used cash in operating activities or continuing operations of $6,097,638 and had a working capital deficit of approximately $38 million, based on the face amount of the current portion of debt. **These factors raise substantial double about the Company's ability to continue as a going concern.** (Bold added)

Because RPC itself has more than justifiably expressed uncertainty about its ability to continue as

a going concern, Alpha Capital should not be compelled to run the substantial risk that RPC will

be unable to respond to a damages award at the end of a lengthy litigation, particularly when

RPC itself agreed, in order to obtain Alpha Capital's investment, that Alpha Capital would be

entitled to the requested injunctive relief to remedy RPC's breach of its agreement with Alpha

Capital.

I am informed, as set forth in the memorandum of law submitted herewith, that the

inability of a defendant to satisfy any ultimate damages award constitutes irreparable harm

supporting an award of preliminary injunctive relief. RPC's clear inability to satisfy any ultimate

judgment should compel this Court to award the requested preliminary injunctive relief.

16

It will also be extremely difficult, if not impossible, to calculate with any certainty the damages resulting from RPC's failure to honor the terms of the Warrant. The dates upon which Alpha Capital would have sold the stock it did not receive upon exercise of the Warrant, and the amounts Alpha Capital would have realized from any such sales, will be difficult to establish with any degree of certainty. Such inability to calculate damages with any degree of precision, I am informed, also constitutes irreparable harm supporting an award of preliminary injunctive relief. It is for all the above reasons that the parties agreed, as set forth above, to an award of preliminary injunctive relief to remedy RPC's wrongs set forth herein.

There is no reason why the Court should not hold RPC to the terms of its agreement and enter the requested injunction. RPC agreed to those terms to obtain Alpha Capital's substantial investment. Alpha Capital has in fact suffered irreparable harm. RPC should not be permitted to evade its agreement when Alpha Capital seeks to obtain the very relief which the parties, at the inception of the investment, agreed Alpha Capital could obtain to remedy RPC's defaults.

There has been no previous application for the relief requested herein.

Wherefore, Alpha Capital respectfully requests that the Court issue the Order as set forth in the Order To Show Cause.

17

Dated: December 20 2010

Konrad Ackermann

United States District Court
Southern District of New York
--------------------------------------------------------x

Whalehaven Capital Fund, Ltd. and
Alpha Capital Anstalt,

                  Plaintiffs,

       v.

Radient Pharmaceuticals Corporation and
John Does 1-10,



                  Defendants.

--------------------------------------------------------x

      Order To Show Cause

      10  Civ.  9490

      Upon the annexed affirmations of Michael Finkelstein and Konrad Ackermann both affirmed under penalties of perjury on December 20, 2010, upon the Summons and Complaint and all prior pleading and proceedings heretofore had herein,

      Let Defendant Radient Pharmaceuticals Corporation ("RPC") show cause before Hon.

          in Courtroom    at the Courthouse located at 500 Pearl Street, New York, New York 10007 on the    day of January, 2010 at    .M. or as soon thereafter as counsel can be heard why an order pursuant to Fed. R. Civ. P. Rule 65 and 28 U.S.C. §2201 should not be entered, pending final determination of this action:

      i) directing RPC immediately: a) to adjust downward to $0.0943 the Exercise Price of the

          warrants (the "Warrants") issued by RPC to Plaintiff Whalehaven Capital Fund,

          Ltd. ("Whalehaven") and Plaintiff Alpha Capital Anstalt ("Alpha Capital")

pursuant to the Securities Purchase Agreement dated November 30, 2009 (the "Securities Purchase Agreement"); and b) to increase to 21,800,673 (9,468,266 for Whalehaven and 12,332,407 for Alpha Capital) the number of shares of RPC common stock for which the Warrants may be exercised, subject to further reduction in the Exercise Price and further increase in the number of shares for which the Warrants may be exercised, all as provided by, and in accordance with, the terms of the Warrant and the Securities Purchase Agreement; and

ii) directing RPC to reserve at least 21,800,673 shares of its common stock, (9,468,266 for Whalehaven and 12,332,407 for Alpha Capital) for issuance to Plaintiffs  upon their exercise of the Warrants, subject to reserving additional shares, all as provided by, and in accordance with, the terms of the Warrants and the Securities Purchase Agreement; and

iii)  restraining RPC from issuing any shares of its common stock until it has complied with its obligation to reserve shares in accordance with its obligations under the Warrants and the Securities Purchase Agreement.

Sufficient cause appearing therefor, it is

Ordered that answering papers, if any, must be served on Kenneth A. Zitter, Esq., 260 Madison Avenue, 18th Floor, New York, New York 10016 at least three days prior to the return date hereof; and it is further,

Ordered that service of the Order to Show Cause, together with the papers upon which it is based, and the Summons and Complaint, by overnight federal express to Radient Pharmaceuticals Corporation at its principal place of business located at 2492 Walnut Avenue, Tustin, CA 92780, with a copy by overnight federal express to its attorneys, Leser Hunter Taubman & Taubman, 17 State Street, New York, NY 10004 such mailings to take place on or before December  , 2010, be deemed good and sufficient service.

Dated: New York, New York
        December   , 2010

ENTER:

_____
U.S.D.J.

3