United States District Court
Southern District of New York
--------------------------------------------------------x

Whalehaven Capital Fund, Ltd. and
Alpha Capital Anstalt,

                                Plaintiffs,

        v.

Radient Pharmaceuticals Corporation,
and John Does 1-10,

                                Defendants.

--------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8·29-11_

Order

10 Civ. 9490 (RJS)

        This matter having come on for a hearing on August 26, 2011, to approve the Final Settlement

Agreement dated August 25, 2011 (the "Settlement Agreement"), between and among Plaintiffs

Whalehaven Capital Fund, Ltd. ("Whalehaven"), Alpha Capital Anstalt ("Alpha Capital") and Defendant

Radient Pharmaceuticals Corporation ("RPC")  and the Court having held a hearing as to the fairness of

the terms and conditions of the Settlement Agreement and being otherwise fully advised in the premises,

the Court hereby finds as follows:

        The Court has been advised that the Parties intend that the issuance of all shares to be issued and

delivered by RPC to Whalehaven and Alpha Capital pursuant to the Settlement Agreement and the

Convertible Promissory Notes issued pursuant to the Settlement Agreement (the "Settlement Shares") and

the resale of the Settlement Shares by Whalehaven and Alpha Capital, assuming satisfaction of all other

applicable securities laws and regulations, will be exempt from registration under the Securities Act of

1933 (the "Securities Act") in reliance upon Section 3(a)(10) of the Securities Act based upon this

Court's finding herein that the terms and conditions of the issuance of the Settlement Shares by RPC to

Whalehaven and Alpha Capital are fair to Whalehaven and Alpha Capital; and

        The hearing was scheduled upon the consent of the Parties, Whalehaven and Alpha Capital have

had adequate notice of the hearing and they are the only parties to whom Settlement Shares will be issued

pursuant to the Settlement Agreement; and

The terms and conditions of the issuance of the Settlement Shares in exchange for: i) the release of certain claims, and ii) the satisfaction of the Notes to be held by Whalehaven and Alpha Capital, as fully set forth in the Settlement Agreement, are fair to Whalehaven and Alpha Capital, the only parties to whom the Settlement Shares will be issued; and

The fairness hearing was open to Whalehaven and Alpha Capital. They were represented by counsel at the hearing who acknowledged that adequate notice of the hearing was given and consented to the entry of this Order;

The Court having determined that, pursuant to Section 3(a)(10) of the Securities Act, the terms and conditions of the issuance of the Settlement Shares are fair to the parties to whom the Settlement Shares will be issued, it is, therefore,

Ordered, that the Settlement Agreement is hereby approved; and it is further

Ordered, that the provisions of this Court's Order dated May 24, 2011 shall remain in full force and effect with respect to all shares previously issued in reliance on the terms thereof; and it is further

Ordered, that the Court shall retain jurisdiction to enforce the terms of the Settlement Agreement and the Convertible Promissory Notes issued in connection therewith.

Dated: August 29, 2011

Richard J. Sullivan
United States District Judge

2

## FINAL SETTLEMENT AGREEMENT

This Final Settlement Agreement (the "**Final Agreement**") is dated this 25th day of August 2011, to be effective as of August 19, 2011 (the "**Effective Date**"), is being entered into among **Radient Pharmaceuticals Corporation** ("**RPC**" or the "**Company**"), **Whalehaven Capital Fund, Ltd.** ("**Whalehaven**") and **Alpha Capital Anstalt** ("**Alpha Capital**," and together with Whalehaven, the "**Plaintiffs**" or the "**Holder(s)**"). The Company and the Holders are hereinafter sometimes collectively referred to as the "**Parties**."

**WHEREAS,** Plaintiffs are the holders of notes, Common Stock and warrants issued by RPC (the "**Issued Securities**") and have the right to receive additional shares of RPC Common Stock pursuant to a Settlement Agreement among the parties dated as of May 9, 2011 (the "**Original Settlement Agreement**"), as amended by an Amendment to Settlement Agreement dated May 23, 2011 (the "**Amendment Agreement**" and together with the Original Settlement Agreement, the "**Settlement Agreement**"); and

**WHEREAS,** a dispute has arisen regarding RPC's performance under the Issued Securities and the Settlement Agreement; and

**WHEREAS,** the parties have signed a Memorandum of Understanding on August 19, 2011 (the "**MOU**") wherein the parties reached an agreement in principle to amend and restate in their entirety the terms of the Settlement Agreement, the notes issued pursuant thereto and settle certain claims the Plaintiffs have against RPC, subject to the execution of this Final Agreement and the Additional Court Order;

**NOW, THEREFORE**, in consideration of the mutual undertakings herein set forth, the parties agree as follows:

**Definitions.**   In addition to the other terms defined herein, when used in this Agreement, the following terms shall have the following respective meanings:

▪   "**2011 Noteholders Consents**" shall have the meaning set forth in Section 10(b) of this Final Agreement.

▪   "**Additional Court Order**" shall mean the additional order of the Court approving this Final Agreement and the transactions contemplated hereby, in substantially the form of **Exhibit A** annexed hereto and made a part hereof.

▪   "**Affiliate**" shall have the same meaning as that term is defined in Rule 405 promulgated under the Securities Act.

▪   "**Beneficially Owned**" "**Beneficially Owning**" or "**Beneficial Ownership**" shall have the same meaning as such terms are defined or interpreted  in Section 13(d) promulgated under the Exchange Act and the rules and regulations thereunder, including Regulation 13d-3.

- "**Business Days**" shall mean any day of the week (other than Saturdays or Sundays) when national banks in New York, New York are open for the transaction of business.

- "**Common Stock**" means the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

- "**Common Stock Equivalents**" means any securities of the Company or the Subsidiaries which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

- "**Converted Alpha Capital Notes**" means notes aggregating $1,616,380.92 that were converted by Alpha Capital as part of the Initial Share Conversions into an aggregate of 11,886,000 Settlement Shares.

- "**Converted Whalehaven Notes**" means notes aggregating $1,239,415.76 that were converted by Whalehaven as part of the Initial Share Conversions into an aggregate of 9,114,000 Settlement Shares.

- "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

- "**Initial Share Conversions**" means (a) the aggregate of 217,000 Settlement Shares issued by the Company to the Whalehaven on May 26, 2011 pursuant to the Initial Settlement Agreement and 8,897,000 Settlement Shares issued by the Company to Whalehaven on June 29, 2011 upon conversion of the Converted Whalehaven Notes, and (b) the aggregate of 283,000 Settlement Shares issued by the Company to Alpha Capital on May 26, 2011 pursuant to the Initial Settlement Agreement and 11,603,000 Settlement Shares issued by the Company to Alpha Capital on June 29, 2011 upon conversion of the Converted Alpha Capital Notes.

- "**Installment Amount**" shall have the meaning ascribed thereto in the Notes.

- "**Installment Payment Date**" shall have the meaning ascribed thereto in the Notes.

- "**Maturity Date**" shall meaning ascribed thereto in the Notes.

- "**MOU**" means the Memorandum of Understanding among the Parties dated August 19, 2011.

- "**Maximum Percentage**" shall mean the Beneficial Ownership of 9.99% of the aggregate number of shares of the Common Stock outstanding.

- **"Non-Restricted Shares"** means shares of RPC Common Stock that are freely tradable, delivered without any restrictive legend and immediately resellable upon receipt by the Holder thereof pursuant to Rule 144(b)(1)(i) under the Securities Act of 1933, as amended, after November 2, 2011 without any additional holding period, volume limitations or manner of sale restrictions.

- **"Notes"** shall mean the convertible promissory notes issued to the Holders pursuant to this Final Agreement in the form of **Exhibit B** annexed hereto and made a part hereof.

- **"Optional Conversion"** shall mean the election by either or both Holders to effect one or more additional conversions of all or any portion of their respective Note into Common Stock pursuant to Section 2.1(a) of the Note.

- **"RPC Security"** shall have the meaning ascribed to it in Section 8 of this Final Agreement.

- **"Settlement Amount"** shall mean the aggregate sum of $10,912,055 payable by the Company to the Plaintiffs under the Settlement Agreement and this Final Agreement, as to Alpha Capital in the amount of $6,176,223.13 and as to Whalehaven in the amount of $4,735,831.87.

- **"Settlement Shares"** shall mean the collective reference all of the shares of Common Stock of the Company issued and issuable to the Holders under the Settlement Agreement and this Final Agreement in respect of payment of the Settlement Amount (a) upon any Optional Conversion(s) of the Notes, (b) on each Installment Payment Date in respect of an Installment Amount, (c) in connection with the "True Up Shares" (as defined in Section 3 of this Final Agreement, and (d) in respect of the shares of Common Stock issued in connection with the Initial Share Conversions of the Converted Alpha Capital Notes and the Converted Whalehaven Notes.

- **"Trading Day"** means a day on which the principal market upon which the Common Stock is traded or listed is open.

- **"Trading Period"** means the period commencing on November 2, 2011 and ending January 3, 2012.

- **"VWAP"** means, as reported by Bloomberg, the volume weighted average price of the Common Stock on the principal market upon which such Common Stock is listed or traded during the applicable period stated therefor.

1.   **Execution of Notes.**   RPC, immediately upon receipt of the Additional Court Order approving this Final Agreement and the 2011 Noteholders Consents, shall execute and deliver to Plaintiffs the Notes in the respective principal amounts as to each of Whalehaven and Alpha Capital that is set for on **Exhibit B** hereto.

2.   **Release.**   Immediately upon receipt of the 2011 Noteholders Consents and the Additional Court Order, the Plaintiffs shall execute and deliver to the Company the release agreement in the form of **Exhibit C** annexed hereto and made a part hereof (the "**Release Agreement**").

3.   **True Up Shares During the Trading Period.**   At any time during the Trading Period, each of Whalehaven and Alpha Capital may, on one occasion only (which need not be the same time for Whalehaven and Alpha Capital), request that the Company deliver to such Holder additional Non-Restricted Shares of Common Stock (the "**True Up Shares**"), calculated as follows:

     (a)      The Parties shall calculate the average of the three lowest VWAPs for the Common Stock, as reported by Bloomberg, during the period commencing May 26, 2011 and terminating on the date of the request by Whalehaven or Alpha Capital, as the case may be (the "**Section 3 VWAP**");

     (b)      With respect to Whalehaven, first, the $1,239,415.76 of Converted Whalehaven Notes shall be divided by the Section 3 VWAP. The result thereof shall be deemed the "**Adjusted Whalehaven Initial Share Conversions**". There shall be deducted from such Adjusted Whalehaven Initial Share Conversions, the 9,114,000 Settlement Shares previously issued to Whalehaven pursuant to the Initial Share Conversions, and the difference shall be the True Up Shares issuable to Whalehaven. RPC shall, deliver within five (5) Trading Days after request by Whalehaven, such number of additional True Up Shares to Whalehaven which shall be Non-Restricted Shares.

     (c)      With respect to Alpha Capital, first, the $1,616,380.92 of Converted Alpha Capital Notes shall be divided by the Section 3 VWAP. The result thereof shall be deemed the "**Adjusted Alpha Capital Initial Share Conversions**". There shall be deducted from such Adjusted Alpha Capital Initial Share Conversions, the 11,886,000 Settlement Shares previously issued to Alpha Capital pursuant to the Initial Share Conversions, and the difference shall be the True Up Shares issuable to Alpha Capital. RPC shall, deliver within five (5) Trading Days after request by Alpha Capital, such number of additional True Up Shares to Alpha Capital which shall be Non-Restricted Shares.

The True Up Shares to be delivered pursuant to this Section 3 shall be delivered subject to the restrictions in Section 8 below. All True Up Shares to be delivered pursuant to this Section 3 shall be in addition to any Common Stock delivered, or required to be delivered by RPC pursuant to the Settlement Agreement or pursuant to the Notes. Notwithstanding the foregoing, the Company's obligation to issue Non-Restricted Shares as True Up Shares is subject to (i) compliance by the respective Holder with the provisions of Section 5 and Section 8 of this Final

Agreement, and (ii) delivery by such Holder to the Company and its legal counsel customary seller's representation letters, at the time of issuance of such True Up Shares and upon any resales thereof. In the event that the provisions of Section 8 are applicable to some or all of the True Up Shares, then, to the extent so applicable, the calculation of such True Up Shares shall be made as at the date such calculation would have otherwise been required to have been made, but the delivery of such True Up Shares shall be postponed to one or more future dates selected by such Holder; provided, that such delivery or deliveries would not violate Section 8.

4.     **Non-Affiliate Status.**  As of the date hereof, the Company is not aware of any basis for any assertion by RPC for either Plaintiff to be an Affiliate of the Company since August 2, 2011.

5.     **Independent Status.**  Each Plaintiff hereby represents and warrants that they are acting independently and not as a "group" as defined in Section 13(d) of the Exchange Act, and as a result the Beneficial Owner Limitation shall be calculated individually as to each Plaintiff, respectively. The Company agrees that based on the foregoing representation and warranty, and subject to the Plaintiffs' continued representations as to the accuracy thereof, the Company shall not, in the absence of either (a) a court order, (b) a pending legal proceeding brought by any unaffiliated third party against either Plaintiff, or (c) correspondence from the Securities and Exchange Commission alleging that either Plaintiff is an Affiliate, claim or take any action based on the allegation that the Plaintiffs are acting as a group or are Affiliates of each other.

   6.  **Reservation of Settlement Shares; Charter Amendment.**

   (a) On August 24, 2011, the Company filed an amendment to its certificate of incorporation, increasing to 750.0 million shares, the aggregate number of shares of Common Stock it is authorized to issue. On or immediately prior to issuance of the Notes, RPC hereby covenants and agrees that it shall reserve an aggregate of 175.0 million shares of authorized and previously unissued Common Stock for potential issuance to the Plaintiffs for issuance upon Plaintiff's conversion of the Notes pursuant to Section 2.1 of the Notes. Additionally, the Company shall reserve and continue to reserve and keep available at all times, free of pre-emptive rights, a sufficient number of shares of Common Stock for purposes of enabling the Company to issue all of the Settlement Shares pursuant to this Final Settlement Agreement and the Notes ("**Required Reservation**"). Within 30 days after the first day the Company does not have reserved the Required Reservation, the Company shall prepare and file with the Securities and Exchange Commission ("**SEC**") a proxy statement under Section 14A of the Exchange Act the "**Proxy Statement**"), or seek to obtain the written consent of the holders of a majority of outstanding Common Stock of the Company (which may include the Plaintiffs and the 2011 Noteholders) and file with the SEC an information statement under Section 14C of the Exchange Act (the "**Information Statement**"); in either case amending the certificate of incorporation of the Company to either (a) increase the authorized number of shares of Common Stock, or (b) effect a reverse split of the outstanding Common Stock (in either case, the "**Charter Amendment**") so that immediately upon the effectiveness of such Charter Amendment, the Required Reservation shall be satisfied. In no event later than ten (10) Trading Days after the SEC informs the Company that there will be no review of the Proxy Statement or Information Statement (as applicable) or that they have no further comments to the Proxy Statement or Information Statement (either, the "**Effectiveness Date**"), the Company shall either: (i) in the

case of a Proxy Statement, provide each stockholder entitled to vote at a special or annual meeting of stockholders of the Company (the "**Stockholder Meeting**") a copy of the Proxy Statement (soliciting each such stockholder's affirmative vote at the Stockholder Meeting for approval of the Charter Amendment); which Stockholders Meeting shall be held as promptly as practicable, but in no event later than twenty (20) Trading Days after the Effectiveness Date (the "**Stockholder Meeting Deadline**"), or (ii) in the case of an Information Statement mail such Information Statement to the Stockholders. In either case, the Company shall (A) cause the Board of Directors of the Company to recommend to the stockholders that they approve the Charter Amendment, and (B) use its best efforts to obtain the affirmative vote in person or by proxy at the Stockholders Meeting of the requisite number of shares of Common Stock to effect the Charter Amendment, or the written consent of the holders of a majority of the Company's then issued and outstanding Common Stock; in either case, in order to satisfy the Required Reservation amount and any actions required to promptly cause such increase in the Required Reservation to occur (such affirmative approval being referred to herein as the "**Stockholder Approval**"). The Company shall be obligated to seek to obtain the Stockholder Approval by the Stockholder Meeting Deadline. If, despite the Company's reasonable best efforts, Stockholder Approval is not obtained at the Stockholder Meeting, the Company shall cause an additional Stockholder Meeting to be held each calendar quarter thereafter or seek the prior written consent of the holders of a majority of the outstanding Common Stock with respect to the Charter Amendment until the Stockholder Approval is obtained. The Company shall respond to all comments received from the SEC with respect to the Proxy Statement or Information Statement as soon as practicable after the receipt thereof (but in no event later than five (5) Business Days after the receipt thereof). Upon receipt of the Stockholder Approval, the Company will promptly cause such increase to occur and reserve the Required Reservation.

(b) In order to insure that the Plaintiffs will, in addition to the 175.0 million shares being reserved hereunder, have the Required Reservation, and that the Company shall also be able to comply with its obligations to the 2011 Noteholders to reserve an adequate number of shares of its Common Stock for issuance to such 2011 Noteholders upon conversion or exercise of securities issued to such 2011 Noteholders, the Company intends to commence the procedures in order to seek and obtain Stockholder Approval for a Charter Amendment within twenty (20) Trading Days following its obtaining of the Additional Court Order and 2011 Noteholders Consent.

7.     **Additional Court Order.**   The Parties shall obtain the Additional Court Order of the United States District Court for the Southern District of New York (the "**Court**") to "So Order" this Final Agreement.  Such Additional Court Order shall, inter alia, approve, pursuant to the provisions of Section 3(a)(10) of the Securities Act of 1933, the Settlement Shares which may or will be issued under this Final Agreement or under the Notes annexed hereto so that all of such Settlement Shares shall be exempt from the registration requirements of the Securities Act of 1933, as amended.  In the event the Court does no "So Order" this Final Agreement by close of business (5:00 p.m. EDT) on August 31, 2011, unless extended by mutual agreement of the Parties, this Final Agreement shall be null and void *ab initio* and the Parties shall retain their rights under the Settlement Agreement as if this Final Agreement was never entered into.

8.      **Beneficial Ownership Limitation**.  The Parties hereby agree that as of August 19, 2011 all Issued Securities and all rights to obtain any Common Stock issued or issuable by RPC to Plaintiffs and all Common Stock currently owned by the Plaintiffs, including Settlement Shares issued in connection with the Initial Share Conversions (collectively the "**RPC Securities**") are hereby subject to the following:

(a)      Notwithstanding anything to the contrary contained in this Final Agreement or the Notes, the Company shall not effect any exercise of any warrant, conversion of any note or issuance of its shares of Common Stock, and a Holder shall not have the right to exercise any portion of any warrant, convert any Note or receive any additional shares of Common Stock, pursuant to any RPC Security and the Company may not issue any shares of Common Stock on any Installment Payment Date or otherwise under the Notes or pursuant to this Final Agreement, to the extent (but only to the extent) that the Holder or any of its Affiliates or any person(s) acting as a "group" with the Holder or its Affiliates, would be the Beneficial Owner(s) of in excess of the Maximum Percentage. To the extent the above limitation applies, the determination of whether the Notes shall be convertible or any warrants shall be exercisable (vis-à-vis other convertible, exercisable or exchangeable securities owned by the Holder or any of its Affiliates) and of which such RPC Securities shall be convertible, exercisable or exchangeable (as among all such securities owned by the Holder and its Affiliates) shall, subject to such Maximum Percentage limitation, be determined on the basis of the first submission to the Company for conversion, exercise or exchange (as the case may be). No prior inability to convert the Notes, exercise warrants or to issue shares of Common Stock, pursuant to this Section 8 shall have any effect on the applicability of the provisions of this Section 8 with respect to any subsequent determination of convertibility or exercise.

(b)      For any reason at any time, upon the written or oral request of the Holder, the Company shall within two (2) Trading Days confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding.

(c)      It is expressly acknowledged by the Holder that the Company is not representing to the Holder that any calculation by the Holder of its Beneficial Ownership or the Maximum Percentage is in compliance with Section 13(d) of the Exchange Act or the rules and regulations thereunder, and the Holder shall be solely responsible for the accuracy of any schedules required to be filed in accordance therewith. Delivery of all shares of Common Stock to each Holder, its Affiliates and any other persons acting as a group (as defined in Section 13(d) of the Exchange Act) with such Holder will be subject to the Maximum Percentage.

(d)      In the event the exercise of the rights described in this Final Agreement or in the Notes would or could result in the issuance of an amount of Common Stock that would exceed the foregoing Maximum Percentage that may be issued to a Plaintiff calculated in the manner described in this Section 8, then the issuance of such additional shares of Common Stock to such Plaintiff will be deferred in whole or in part until such time as such Plaintiff is able to Beneficially Own such Common Stock without exceeding the Maximum Percentage set forth calculated in the manner described in this Section 8.  For all purposes of this Final Agreement and the Notes, the calculation of the amount of Common Stock that would be deliverable, but for the application of the provisions of this Section 8, shall be made as of the date otherwise required

to be calculated hereunder or under the Notes, notwithstanding the postponement of delivery of such Common Stock.

(e)     For all purposes of this Section 8, a determination as to any group status as contemplated above shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder.   For purposes of this Section 8, in determining the number of outstanding shares of Common Stock, a Holder may rely on the number of outstanding shares of Common Stock as reflected in the Company's most recent periodic or annual report filed with the Commission, as the case may be.   In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of RPC Securities or issuance of shares of Common Stock pursuant to the Settlement Agreement and this Final Agreement, by the Holder or its Affiliates since the date as of which such number of outstanding shares of Common Stock was reported.

(f)     The provisions of this Section 8 shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 8 to correct this Section 8 (or any portion hereof) which may be defective or inconsistent with the intended Maximum Percentage herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation.   The limitations contained in this Section 8 shall apply to a successor in interest to the Company and any successor Holder of any of the RPC Securities.

9.     **Holding Period**.  The Company acknowledges that the MOU and this Final Agreement do not modify or restart any holding period of the Plaintiffs for any RPC Security held by the Plaintiffs.   The Company confirms and represents that it has been advised by counsel that nothing in this agreement impairs the applicability of the exemption from registration pursuant to Section 3(a)(10) to any Settlement Shares delivered or to be delivered by RPC to Whalehaven and Alpha Capital by RPC pursuant to the terms of this Final Agreement and the Notes.   For so long as each of Whalehaven and Alpha Capital comply with the provisions of Section 8 of this Final Agreement, RPC shall deliver to such Holder(s) Non-Restricted Shares.   For avoidance of doubt, RPC acknowledges that from and after November 2, 2011, and subject at all times to compliance at the time of issuance by the Holders with the provisions of Section 5 and Section 8 of this Final Agreement, the Common Stock issuable pursuant to this Final Agreement and upon conversion of the Notes are not "restricted securities" as that term is defined in Rule 144(a)(3) of the Exchange Act and will be otherwise Non-Restricted Shares.

10.     **Additional Covenants**.

(a)     The parties shall apply to the District Court to approve, pursuant to the provisions of Section 3(a)(10) of the Securities Act of 1933, the Settlement Shares which were issued pursuant to the Settlement Agreement and which may or will be issued hereunder or under the Notes annexed hereto shall be exempt from the registration requirements of the Securities Act of 1933, as amended, and subject to other applicable provisions of the securities laws and the rules and regulations thereunder, shall, upon the resale thereof, be Non-Restricted Shares.  In the event such approval is not obtained, this Final Agreement shall be null and void, *ab initio*, and the parties shall retain their respective rights under the Settlement Agreement.

(b)     Each of the Parties hereto do acknowledge and agree that the execution and delivery of this Agreement is subject to the written approval and consent of Iroquois Master Fund Limited, Cranshire Capital, LP, Bristol Investment Fund Ltd., Kingsbrook Opportunities Master Fund LP and Freestone Advantage Partners LP (the "**2011 Noteholders Consents**"), on or before 3:00 p.m. (EDT) on August 26, 2011, which date and time may be extended only by mutual agreement of the Parties.

(c)     Each Holder shall retain the warrants it received in the November 2009 Registered Direct Offering and in the private financing that RPC closed in March and April 2010 (the "**Warrants**"). The Parties agree that the exercise price of the Warrants is $0.28 and that the number of shares of Common Stock available for issuance upon exercise of Whalehaven's Warrants is 188,000 and that the number of shares available for issuance upon exercise of Alpha Capital's Warrants is 207,689.  Any exercise of the Warrants by either Plaintiff shall reduce RPC's obligation to that Plaintiff under the Notes by the amount of any such exercise. For illustrative purposes only, if Alpha Capital exercises its Warrants for 100,000 shares of stock, RPC's obligation to Alpha Capital under the Notes shall be reduced by $28,000. RPC represents that Plaintiffs may exercise the Warrants immediately and that RPC can issue all shares required to be issued pursuant to any such Warrant exercise. Plaintiffs agree not to exercise the Warrant prior to the earlier to occur of August 31, 2011, or the date of the Additional Court Order.  On the Maturity Date, provided that the Notes have been paid in full, Whalehaven and Alpha Capital shall return to RPC all of the Warrants and the warrants received in 2007 to the extent they have not been previously exercised in full. RPC shall thereafter deem the Warrants null and void.

(d)     The obligation of the Company's legal counsel to issue opinion letters as may be required by any transfer agent of the Company's Common Stock are subject to the Holder's execution and delivery of customary seller's representation letters at the time of resale of any Non-Restricted Shares.

11.   **Integration; Entire Agreement.**  Upon timely receipt of the 2011 Noteholders Consents and the Additional Court Order, this Final Agreement shall constitute the entire agreement and understanding among the Parties, written or oral, with respect to the subject matter hereof, amends and restates in their entirety the Settlement Agreement and the MOU, and, subject at all times to the provisions of Section 10(a) of this Final Agreement, supersedes such Settlement Agreement and MOU which shall no longer have any further force or effect.  Notwithstanding the foregoing, to the extent (and only to the extent) that (i) the Section 3(a)(10) exemption was applicable to Settlement Shares issued prior to the Effective Date under the Settlement Agreement and the Court order dated May 24, 2011, such Settlement Agreement shall remain applicable, and (ii) the blocker provision contained in the MOU shall also remain applicable.

12.   **Governing Law; Jurisdiction.**  All questions concerning the construction, validity, enforcement and interpretation of this Final Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof.  The United States District Court for the Southern District

of New York will retain exclusive jurisdiction to enforce adjudicate any dispute hereunder. The Company and Plaintiffs acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Final Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties hereto shall be entitled to seek an injunction or injunctions to prevent or cure breaches of the provisions of this Final Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity. In the event either party commences suit hereunder, the prevailing party shall be entitled to reimbursement from the other party of its reasonable attorney's fees, costs and expenses.

13.   **Counterparts.**  This Final Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to any other party, it being understood that all parties need not sign the same counterpart.  In the event that any signature is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature were an original thereof.  In the event of any dispute under this Final Agreement the prevailing party will be entitled to reasonable legal fees.

**[BALANCE OF THIS PAGE LEFT INTENTIONALLY BLANK-SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF,** the Parties have duly executed and delivered this Final Agreement, to be effective as of the Effective Date.

**RADIENT PHARMACEUTICALS CORPORATION**

By: _____
Its:

**WHALEHAVEN CAPITAL FUND, LTD.**       **ALPHA CAPITAL ANSTALT**

By: _____       By: _____
Its:                                 Its:

{HTW00001476; 10}

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Final Agreement, to be effective as of the Effective Date.

**RADIENT PHARMACEUTICALS CORPORATION**

By: _____
Its:

**WHALEHAVEN CAPITAL FUND, LTD.**      **ALPHA CAPITAL ANSTALT**

By: VADIM MATI                           By: _____
Its: CFO                                 Its:

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Final Agreement, to be effective as of the Effective Date.

**RADIENT PHARMACEUTICALS CORPORATION**

By: _____
Its:

**WHALEHAVEN CAPITAL FUND, LTD.**          **ALPHA CAPITAL ANSTALT**

By: _____            By: _Konrad Ackermann_____
Its:                                    Its: _Director_

United States District Court
Southern District of New York
-------------------------------------------------------x

Whalehaven Capital Fund, Ltd. and
Alpha Capital Anstalt,

                          Plaintiffs,                          <u>Order</u>

           v.

                                             10 Civ. 9490 (RJS)

Radient Pharmaceuticals Corporation,
and John Does 1-10,

                          Defendants.

-------------------------------------------------------x


      This matter having come on for a hearing on August 26, 2011, to approve the Final

Settlement Agreement dated August 25, 2011 (the "Settlement Agreement"), between and among

Plaintiffs Whalehaven Capital Fund, Ltd. ("Whalehaven"), Alpha Capital Anstalt ("Alpha

Capital") and Defendant Radient Pharmaceuticals Corporation ("RPC")  and the Court having

held a hearing as to the fairness of the terms and conditions of the Settlement Agreement and

being otherwise fully advised in the premises, the Court hereby finds as follows:

      The Court has been advised that the Parties intend that the issuance of all shares to be

issued and delivered by RPC to Whalehaven and Alpha Capital pursuant to the Settlement

Agreement and the Convertible Promissory Notes issued pursuant to the Settlement Agreement

(the "Settlement Shares") and the resale of the Settlement Shares by Whalehaven and Alpha

Capital, assuming satisfaction of all other applicable securities laws and regulations, will be

exempt from registration under the Securities Act of 1933 (the "Securities Act") in reliance upon

Section 3(a)(10) of the Securities Act based upon this Court's finding herein that the terms and

conditions of the issuance of the Settlement Shares by RPC to Whalehaven and Alpha Capital are fair to Whalehaven and Alpha Capital; and

The hearing was scheduled upon the consent of the Parties, Whalehaven and Alpha Capital have had adequate notice of the hearing and they are the only parties to whom Settlement Shares will be issued pursuant to the Settlement Agreement; and

The terms and conditions of the issuance of the Settlement Shares in exchange for: I) the release of certain claims, and ii) the satisfaction of the Notes to be held by Whalehaven and Alpha Capital as fully set forth in the Settlement Agreement are fair to Whalehaven and Alpha Capital, the only parties to whom the Settlement Shares will be issued; and

The fairness hearing was open to Whalehaven and Alpha Capital. They were represented by counsel at the hearing who acknowledged that adequate notice of the hearing was given and consented to the entry of this Order;

It is, therefore,

Ordered, that the Settlement Agreement is hereby approved; the terms and conditions of the issuance of the Settlement Shares are fair to the parties to whom the Settlement Shares will be issued, within the meaning of Section 3(a)(10) of the Securities Act; and the issuance of the Settlement Shares by RPC or by it transfer agent, Corporate Stock Transfer, Inc., to, and the resale of the Settlement Shares in the United States by, Whalehaven and Alpha Capital, assuming satisfaction of all other applicable securities laws and regulations, will be exempt from registration under the Securities Act; and it is further

Ordered, that the provisions of this Court's Order dated May 24, 2011 shall remain in full force and effect with respect to all shares previously issued in reliance on the terms thereof; and it is further

Ordered, that the Court shall retain jurisdiction to enforce the terms of the Settlement Agreement and the Convertible Promissory Notes issued in connection therewith.

Dated: August    , 2011

                                        Enter:


                                        _____
                                                U.S.D.J.

3

Exhibit B

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER, AT THE COMPANY'S EXPENSE), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.  NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

**Principal Amount: $4,559,842.41**                           **Issue Date: August 26, 2011**

## CONVERTIBLE PROMISSORY NOTE

FOR VALUE RECEIVED, **RADIENT PHARMACEUTICALS CORPORATION,** a Delaware corporation (hereinafter called "**Debtor**"), hereby promises to pay to the order of **ALPHA CAPITAL ANSTALT** (the "**Holder**"), with an address at Pradafant 7, 9490 Furstentums, Vaduz, Lichtenstein, Fax: 011-42-32323196, without demand, the sum of **Four Million Five Hundred Fifty Nine Thousand Eight Hundred Forty Two Dollars Forty One Cents ($4,559,842.41)** ("**Principal Amount**"), with interest accruing thereon, on April 15, 2013 (the "**Maturity Date**"), if not sooner paid or modified as permitted herein.

This Convertible Promissory Note (the "**Note**")  has been entered into pursuant to the terms of a Final Settlement Agreement by and among the Debtor, the Holder and another holder (the "**Other Holder**") of a convertible promissory note (the "**Other Note**"), dated of even date herewith (the "**Final Settlement Agreement**"), for an aggregate Principal Amount of $8,056,258.32.   Unless otherwise separately defined herein, each capitalized term used in this Note shall have the same meaning as set forth in the Final Settlement Agreement.  The following terms shall apply to this Note:

## ARTICLE I
## GENERAL PROVISIONS

1.1      Interest Rate.  Interest payable on this Note shall accrue at the annual rate of eight percent (8%) from the Issue Date through the Maturity Date.  Interest shall be payable on each Installment Payment Date and on the Maturity Date, accelerated or otherwise, when the Principal Amount and remaining accrued but unpaid interest shall be due and payable, or sooner as described below.

1.2      Default Interest.  After the Maturity Date and during the pendency of an Event of Default (as described in Article III), a default interest rate of eighteen percent (18%) per annum shall be in effect.

1.3      Conversion Privileges.  The Conversion Rights (as set forth in Article II) shall remain in full force and effect immediately from the Issue Date and until the Note is paid in full regardless of the occurrence of an Event of Default.  This Note shall be payable in full on the Maturity Date, unless previously converted into Common Stock in accordance with Article II hereof.

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER, AT THE COMPANY'S EXPENSE), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.  NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

**Principal Amount: $3,496,415.91**                                  **Issue Date: August 26, 2011**

## CONVERTIBLE PROMISSORY NOTE

FOR VALUE RECEIVED, **RADIENT PHARMACEUTICALS CORPORATION**, a Delaware corporation (hereinafter called "**Debtor**"), hereby promises to pay to the order of **WHALEHAVEN CAPITAL FUND, LTD** (the "**Holder**"), with an address at 560 Sylvan Avenue, Suite 3170, Englewood Cliffs, NJ 07632 Fax (201) 408–5125, without demand, the sum of **Three Million Four Hundred Ninety Six Thousand Four Hundred Fifteen Dollars Ninety One Cents ($3,496,415.91)** ("**Principal Amount**"), with interest accruing thereon, on April 15, 2013 (the "**Maturity Date**"), if not sooner paid or modified as permitted herein.

This Convertible Promissory Note (the "**Note**")  has been entered into pursuant to the terms of a Final Settlement Agreement by and among the Debtor, the Holder and another holder (the "**Other Holder**") of a convertible promissory note (the "**Other Note**"), dated of even date herewith (the "**Final Settlement Agreement**"), for an aggregate Principal Amount of $8,056,258.32.

Unless otherwise separately defined herein, each capitalized term used in this Note shall have the same meaning as set forth in the Final Settlement Agreement.  The following terms shall apply to this Note:

## ARTICLE I
## GENERAL PROVISIONS

1.1     Interest Rate.  Interest payable on this Note shall accrue at the annual rate of eight percent (8%) from the Issue Date through the Maturity Date.  Interest shall be payable on each Installment Payment Date and on the Maturity Date, accelerated or otherwise, when the Principal Amount and remaining accrued but unpaid interest shall be due and payable, or sooner as described below.

1.2     Default Interest.  After the Maturity Date and during the pendency of an Event of Default (as described in Article III), a default interest rate of eighteen percent (18%) per annum shall be in effect.

1.3     Conversion Privileges.  The Conversion Rights (as set forth in Article II) shall remain in full force and effect immediately from the Issue Date and until the Note is paid in full regardless of the occurrence of an Event of Default.  This Note shall be payable in full on the Maturity Date, unless previously converted into Common Stock in accordance with Article II hereof.

**1.4**    <u>Minimum Installment Amount Payments</u>.    Amortizing payments of the outstanding Principal Amount of this Note shall commence on January 31, 2012 and on the last Business Day of each subsequent month thereafter (each, an "**Installment Payment Date**") until the Principal Amount has been repaid in full, whether by the payment of cash or by the conversion of such Principal Amount into Common Stock pursuant to the terms hereof.  On each Installment Payment Date, the Debtor shall make payments to the Holder in an amount equal to six and one-quarter percent (6.25%) of the initial Principal Amount of this Note, plus accrued interest and any other amounts which are then owing under this Note that have not been paid (collectively, the "**Installment Amount**").  In lieu of cash, at the Debtor's sole election, the Debtor shall have the absolute right and option to pay all or any portion of any one or more Installment Amount in shares of Debtor's Common Stock; ***provided***, that (a) such Common Stock is, when issued and delivered, Non-Restricted Shares, (b) such Non-Restricted Shares are delivered within five (5) Trading Days of each Installment Payment Date (c) such Non-Restricted Shares are in an amount that shall not exceed the limitations set forth in Section 8 of the Final Settlement Agreement, and (d) no Event of Default, nor event that through the giving of notice or passage of time would constitute and Event of Default is pending and continuing  If paid in Common Stock, the total amount of Common Stock to be delivered as payment of the any Installment Amount shall be determined by dividing the Installment Amount being paid by 80% of the average of the three lowest VWAPs for the 20 Trading Days preceding the applicable Installment Payment Date.  The obligation of the Debtor's legal counsel to issue opinion letters as may be required by any transfer agent of the Debtor's Common Stock is subject to the Holder's execution and delivery of customary seller's representation letters at the time of resale of such Non-Restricted Shares.  **In no event shall the Debtor be required to pay in cash any Installment Amount or any other amount payable under this Note if the inability to issue Common Stock arises by virtue of the application of Section 8 of the Final Agreement.**

**1.5**    <u>Credit for Conversions</u>.  Amounts of conversions made by the Debtor or Holder pursuant to Section 1.4, Section 2.1 or Article III shall be applied first against outstanding fees and damages, then outstanding interest and then to Principal Amount of any not yet due Installment Amounts at the discretion of the Holder.  Any Principal Amount, interest and any other sum arising under this Note and the Final Settlement Agreement that remains outstanding on the Maturity Date shall be due and payable on the Maturity Date.

**1.6**    <u>Incorporation by Reference</u>.    All of the terms and conditions of the Final Agreement, including the provisions of Section 8 thereof, are hereby incorporated by this reference in this Note.

## ARTICLE II
## CONVERSION RIGHTS

The Holder shall have the right to convert the Principal Amount and any interest due under this Note into shares of the Debtor's Common Stock, $0.001 par value per share ("**Common Stock**"), as set forth below.

**2.1.**    <u>Conversion into the Debtor's Common Stock</u>.

(a)    The Holder shall have the right from and after the Issue Date until this Note is fully paid, to convert any outstanding and unpaid portion of the Principal Amount of this Note, and accrued but unpaid interest, at the election of the Holder (the date of giving of such notice of conversion being a "**Conversion Date**") into fully paid and non-assessable shares of Common Stock, or any shares of capital stock of Debtor into which such Common Stock shall hereafter be changed or reclassified, at the conversion price as defined in <u>Section 2.1(b)</u> hereof, determined as provided herein.  Upon delivery to the

Debtor of a completed notice of conversion, a form of which is annexed hereto as **Exhibit A** (the "**Notice of Conversion**"), Debtor shall issue and deliver to the Holder within five (5) Trading Days after the Conversion Date (such fifth day being the "**Delivery Date**") that number of shares of Common Stock for the portion of the Note converted in accordance with the foregoing.  The Holder will not be required to surrender the Note to the Debtor until the Note has been fully converted or satisfied.  The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing that portion of the Principal Amount of the Note and accrued but unpaid interest, if any, to be converted, by the Conversion Price (as defined herein).  The shares of Common Stock to be delivered pursuant to a Notice of Conversion shall, when converted and delivered on and after November 2, 2011, be Non-Restricted Shares.

(b)      Subject to adjustment as provided in Section 2.1(c) hereof, the conversion price ("**Conversion Price**") shall be 80% of the average of the three lowest VWAPs for the 20 Trading Days preceding the Conversion Date.

(c)      The Conversion Price and number and kind of shares or other securities to be issued upon conversion determined pursuant to Section 2.1(a) hereof, shall be subject to adjustment from time to time upon the happening of certain events while this conversion right (the "**Conversion Rights**") remains outstanding, as follows:

A.      Merger, Sale of Assets, etc.  If (A) the Debtor effects any merger or consolidation of the Debtor with or into another entity, (B) the Debtor effects any sale of all or substantially all of its assets in one or a series of related transactions,  (C) any tender offer or exchange offer (whether by the Debtor or another entity) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, (D) the Debtor consummates a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more persons or entities whereby such other persons or entities acquire more than the 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by such other persons or entities making or party to, or associated or affiliated with the other persons or entities making or party to, such stock purchase agreement or other business combination), (E) any "person" or "group" (as these terms are used for purposes of Sections 13(d) and 14(d) of the 1934 Act) is or shall become the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of 50% of the aggregate Common Stock of the Debtor), or (F) the Debtor effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (other than a reverse merger) (in any such case, a "**Fundamental Transaction**"), this Note, as to the unpaid portion of the Principal Amount and accrued interest thereon, if any, shall thereafter be deemed to evidence the right to convert into such number and kind of shares or other securities and property as would have been issuable or distributable on account of such Fundamental Transaction, upon or with respect to the securities subject to the Conversion Rights immediately prior to such Fundamental Transaction.  The foregoing provision shall similarly apply to successive Fundamental Transactions of a similar nature by any such successor or purchaser.  Without limiting the generality of the foregoing, the anti-dilution provisions of this Section shall apply to such securities of such successor or purchaser after any such Fundamental Transaction.

B.      Reclassification, etc.  If the Debtor at any time shall, by reclassification or otherwise, change the Common Stock into the same or a different number of securities of any class or classes that may be issued or outstanding, this Note, as to the unpaid portion  of the Principal Amount and accrued interest thereon, shall thereafter be deemed to evidence the right to purchase an adjusted number of such securities and kind of securities as would have been issuable as the result of such change with respect to the Common Stock immediately prior to such reclassification or other change.

C.    Stock Splits, Combinations and Dividends.  If the shares of Common Stock are subdivided or combined into a greater or smaller number of shares of Common Stock, or if a dividend is paid on the Common Stock in shares of Common Stock, the Conversion Price shall be proportionately reduced in case of subdivision of shares or stock dividend or proportionately increased in the case of combination of shares, in each such case by the ratio which the total number of shares of Common Stock outstanding immediately after such event bears to the total number of shares of Common Stock outstanding immediately prior to such event.

D.    Share Issuance.  So long as this Note is outstanding, if the Debtor shall issue any Common Stock, prior to the complete conversion or payment of this Note, for a consideration per share that is less than the Conversion Price that would be in effect at the time of such issue, then, and thereafter successively upon each such issuance, the Conversion Price shall be reduced to such other lower issue price.  For purposes of this adjustment, the issuance of any security or debt instrument of the Debtor carrying the right to convert such security or debt instrument into Common Stock or of any warrant, right or option to purchase Common Stock shall result in an adjustment to the Conversion Price upon the issuance of the above-described security, debt instrument, warrant, right, or option and again upon the issuance of shares of Common Stock upon exercise of such conversion or purchase rights if such issuance is at a price lower than the then applicable Conversion Price.  Common Stock issued or issuable by the Debtor for no consideration will be deemed issuable or to have been issued for $0.001 per share of Common Stock.  The reduction of the Conversion Price described in this paragraph is in addition to the other rights of the Holder described in the Final Settlement Agreement.

(d)    Whenever the Conversion Price is adjusted pursuant to Section 2.1(c) above, the Debtor shall promptly, but not later than the fifth (5th) Business Day after the effectiveness of the adjustment, provide notice to the Holder setting forth the Conversion Price after such adjustment and setting forth a statement of the facts requiring such adjustment.  Failure to provide the foregoing notice is an Event of Default under this Note.

(e)    During the period the Conversion Rights exists, Debtor will reserve from its authorized and un-issued Common Stock on behalf of the Holder and Other Holder not less than 175,000,000 shares of Common Stock and such other Common Stock as described in the Final Settlement Agreement.  Debtor represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable.  Debtor agrees that its issuance of this Note shall constitute full authority to its officers, agents, and transfer agents who are charged with the duty of executing and issuing stock certificates to execute and issue the necessary certificates for shares of Common Stock upon the conversion of this Note.

2.2    Method of Conversion.  This Note may be converted by the Holder in whole or in part as described in Section 2.1(a) hereof.  Upon partial conversion of this Note, a new Note containing the same date and provisions of this Note shall, at the request of the Holder, be issued by the Debtor to the Holder for the balance of the Principal Amount of this Note and accrued but unpaid interest which shall not have been converted or paid, upon surrender of the existing Note.

**ARTICLE III**
**ACCELERATION AND REDEMPTION**

3.1.    Redemption.  Upon ten 10 days prior written notice, the Debtor may redeem this Note by payment to the Holder of all sums owed pursuant to this Note ("Redemption Payment") in cash.  The Redemption Payment may only be made by wire transfer.  Until the Holder receives the Redemption

Payment, Holder shall retain the Conversion Rights and shall be permitted to convert any amount owed pursuant to this Note. A Redemption Payment may not be made with respect to any amount for which Holder has submitted a Notice of Conversion prior to Holder's receipt of the Redemption Payment.

3.2. <u>Fundamental Transaction</u>. Upon the occurrence of a Fundamental Transaction, then in addition to the Holder's rights described in <u>Section 2.1(c)(A)</u>, until twenty (20) business days after the Debtor notifies the Holder of the occurrence of the Fundamental Transaction, the Holder may elect to accelerate the Maturity Date as of the date of the Fundamental Transaction and receive payment for the then outstanding Principal Amount, and any other amounts owed to the Holder pursuant to the Final Agreement in the form of Common Stock of the Debtor.

## ARTICLE IV
## EVENT OF DEFAULT

The occurrence and, except with respect to Section 4.1 below, continuation of any of the following events of default ("**Event of Default**") occurring after the Issued Date, shall, at the option of the Holder hereof, make all sums of the Principal Amount and accrued but unpaid interest then remaining unpaid hereon and all other amounts payable hereunder immediately due and payable, upon demand, without presentment or grace period, all of which hereby are expressly waived, except as set forth below:

4.1 <u>Failure to Pay Principal Amount or Interest</u>. The Debtor fails to timely pay any amounts (including delivery of Common Stock pursuant to Section 1.4 and Article II hereof) due under this Note.

4.2 <u>Breach of Covenant</u>. The Debtor breaches any material covenant or other term or condition of the Final Settlement Agreement or this Note, except for a breach of payment, in any material respect and such breach, if subject to cure, continues for a period of twenty (20) days after written notice to the Debtor from the Holder.

4.3 <u>Breach of Representations and Warranties</u>. Any material representation or warranty of the Debtor made herein or the Final Settlement Agreement shall be false or misleading in any material respect.

4.4 <u>Liquidation</u>. Any dissolution, liquidation or winding up by Debtor or a subsidiary of a substantial portion of their business.

4.5 <u>Cessation of Operations</u>. Any cessation of operations by Debtor or a subsidiary.

4.6 <u>Maintenance of Assets</u>. The failure by Debtor or any subsidiary to maintain any material intellectual property rights, personal, real property, equipment, leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured with fifteen (15) days after written notice to the Debtor from the Holder.

4.7 <u>Receiver or Trustee</u>. The Debtor or any subsidiary shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business; or such a receiver or trustee shall otherwise be appointed.

4.8 <u>Judgments</u>. Any money judgment, writ or similar final process shall be entered or made in a non-appealable adjudication against Debtor or any subsidiary or any of its property or other assets for more than $100,000 in excess of the Debtor's insurance coverage, unless stayed vacated or satisfied within thirty (30) days.

4.9     Bankruptcy.  Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings or relief under any bankruptcy law, or the issuance of any notice in relation to such event, for the relief of debtors shall be instituted by or against the Debtor or any subsidiary.

4.10    Delisting.  An event resulting in the Common Stock no longer being quoted on the OTC Markets Group, Inc. (the "**OTC**"); failure to comply with the requirements for continued quotation on the OTC for a period of seven (7) consecutive Trading Days; or notification from the OTC that the Debtor is not in compliance with the conditions for such continued quotation and such non-compliance continues for seven (7) days following such notification.

4.11    Non-Payment.  A default by the Debtor or any subsidiary under any one or more obligations in an aggregate monetary amount in excess of $100,000 for more than twenty (20) days after the due date, unless the Debtor or such subsidiary is contesting the validity of such obligation in good faith.

4.12    Stop Trade.  A Commission or judicial stop trade order or OTC suspension that lasts for ten (10) or more consecutive Trading Days.

4.13    Failure to Deliver Common Stock or Replacement Note.  Debtor's failures to deliver Common Stock to the Holder pursuant to and in the form required by this Note within five (5) Trading Days of the date of any Installment Payment Date or date of delivery of a Notice of Conversion or, if required, a replacement Note within five (5) Trading Days following a partial conversion.

4.14    Reservation Default.  Failure by the Debtor to have reserved for issuance upon conversion of the Note or as described in the Final Settlement Agreement, the number of shares of Common Stock as set forth in the Final Settlement Agreement and this Note, and such failure shall continue for a period of twenty (20) Trading Days.

4.15    Financial Statement Restatement.  The restatement after the date hereof of any financial statements filed by the Debtor with the Commission for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statements, have constituted a material adverse effect. For the avoidance of doubt, any restatement related to new accounting pronouncements, including without limitation, for derivative accounting shall not constitute a default under this Section 4.15.

4.16    Reverse Splits.  The Debtor effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

4.17    Notification Failure.  A failure by Debtor to notify Holder of any material event of which Debtor is obligated to notify Holder pursuant to the terms of this Note or the Final Settlement Agreement.

4.18    Cross Default.  A default by the Debtor of a material term, covenant, warranty or undertaking of any other material agreement to which the Debtor and Holder are parties, or the occurrence of an event of default under any such other agreement to which Debtor and Holder are parties which is not cured after any required notice and/or cure period.

4.19    Other Note Default.  The occurrence and continuation of an Event of Default under the Other Note.

4.20    Unavailability of Rule 144(b)(1)(i).     Due to the Debtor's non-compliance with the requirements of paragraph (c)(i) of Rule 144, the Holder shall not have available to it the provisions of

Section 144(b)(1)(i) of Rule 144 promulgated under the 1933 Act, unless such unavailability is due to Holder's status as an Affiliate or "control person" of the Debtor, or as a result of any amendment or change to Rule 144 or other securities laws.

## ARTICLE V
## MISCELLANEOUS

5.1     _Failure or Indulgence Not Waiver_.  No failure or delay on the part of the Holder hereof in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.  All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

5.2     _Notices_.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the first business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be: (i) if to the Debtor to: Radient Pharmaceuticals Corporation, 2492 Walnut Avenue, Suite 100 Tustin, California 92780, Attn: Douglas C. MacLellan, CEO facsimile: (714) 505–4464, with a copy by fax only to (which shall not constitute notice): Hunter Taubman Weiss LLP, 17 State Street, Suite 2000, New York, NY 10004, Attn: Stephen A. Weiss, Esq., facsimile: (212) 202–6380, and (ii) if to the Holder to the name, address and facsimile number set forth on the front page of this Note, with copies, with an additional copy by fax only to (which shall not constitute notice): Grushko & Mittman, P.C., 515 Rockaway Avenue, Valley Stream, New York 11581, facsimile: (212) 697–3575.

5.3     _Amendment Provision_.  The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

5.4     _Assignability_.  This Note shall be binding upon the Debtor and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns.  The Debtor may not assign its obligations under this Note without the written consent of the Holder.

5.5     _Cost of Collection_.  If default is made in the payment of this Note, Debtor shall pay the Holder hereof reasonable costs of collection, including reasonable attorneys' fees.

5.6     _Governing Law_.  This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction.  Any action brought by either party hereto against the other concerning the transactions contemplated by this Agreement must be brought only in the United States District Court for Southern District of New York.  Both parties hereto and the individual signing this Agreement on behalf of the Debtor agree to submit to the jurisdiction of such court.  The

prevailing party shall be entitled to recover from the other party its reasonable attorneys' fees and costs. In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or unenforceability of any other provision of this Note.  Nothing contained herein shall be deemed or operate to preclude the Holder from enforcing a judgment or other decision in favor of the Holder.  The Debtor acknowledges and agrees that irreparable damage would occur in the event that any of the provisions of this Note were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the Holder shall be entitled to seek an injunction or injunctions to prevent or cure breaches of the provisions of this Note and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity.

     5.7   <u>Maximum Payments</u>.  Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum rate permitted by applicable law.  In the event that the rate of interest required to be paid or other charges hereunder exceed the maximum rate permitted by applicable law, any payments in excess of such maximum rate shall be credited against amounts owed by the Debtor to the Holder and thus refunded to the Debtor.

     5.8   <u>Non-Business Days</u>.  Whenever any payment or any action to be made shall be due on a Saturday, Sunday or a public holiday under the laws of the State of New York, such payment may be due or action shall be required on the next succeeding business day and, for such payment, such next succeeding day shall be included in the calculation of the amount of accrued interest payable on such date.

     5.9   <u>Shareholder Status</u>.  The Holder shall not have rights as a shareholder of the Debtor with respect to unconverted portions of this Note.  However, the Holder will have the rights of a shareholder of the Debtor with respect to the shares of Common Stock to be received after delivery by the Holder of a Conversion Notice to the Debtor.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, Debtor has caused this Note to be signed in its name by an authorized officer as of the 23rd day of August, 2011.

**RADIENT PHARMACEUTICALS CORPORATION**

By: _____
      Name:
      Title:

WITNESS:

_____

## EXHIBIT A - NOTICE OF CONVERSION

(To be executed by the Registered Holder in order to convert the Note)

    The undersigned hereby elects to convert \$_____ of the Principal Amount and \$_____ of the interest due on the Note issued by Radient Pharmaceuticals Corporation on August 23, 2011 into shares of Common Stock of Radient Pharmaceuticals Corporation (the "**Debtor**") according to the conditions set forth in such Note, as of the date written below.

Date of Conversion:_____

Conversion Price:_____

Number of Shares of Common Stock Beneficially Owned on the Conversion Date: Less than 10% of the outstanding Common Stock of Radient Pharmaceuticals Corporation.

Shares To Be Delivered:_____

Signature:_____

Print Name:_____

Address:_____

           _____

Exhibit C

## RELEASE AGREEMENT

This Release Agreement ("**Agreement**") is entered into by and between by and among **Radient Pharmaceuticals Corporation** ("**RPC**" or the "**Company**"); **Whalehaven Capital Fund, Ltd.** ("**Whalehaven**") and **Alpha Capital Anstalt** ("**Alpha Capital**,"). The Company, Whalehaven and Alpha Capital are hereinafter sometimes collectively referred to as the "**Parties**."

**WHEREAS**, a dispute has arisen between the Parties.  Alpha Capital and Whalehaven commenced a law suit (the "**Lawsuit**") against the Company and John Does 1-10 in the United States District Court for the Southern District of New York (the "**Court**"), Case No. 10 CV 9490 (RJS); and

**WHEREAS**, on May 10, 2011, the Parties entered into a Settlement Agreement (the "**Original Settlement Agreement**"), which was amended on May 23, 2011 (the "**Amendment Agreement**" and collectively with the Original Settlement Agreement, the "**Settlement Agreement**"); and.

**WHEREAS**, on August 25, 2011, the Parties entered into a settlement agreement that amended and restated the Settlement Agreement (the "**Final Settlement Agreement**"); and

**WHEREAS**, as part of the Final Settlement Agreement, the Parties agreed to execute and deliver this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises set forth
herein, the Parties agree as follows:

1.      **Definitions.**   Unless otherwise defined herein, all capitalized terms when used in this Agreement shall have the same meaning as is set forth in the Final Settlement Agreement.

2.      **Release**.       As a material inducement to the Company to enter into the Final Settlement Agreement, and subject at all times to the terms of this Agreement, Whalehaven and Alpha Capital and each of its respective owners, stockholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, divisions, subsidiaries, affiliates and all persons acting under or in concert with any of them (collectively the "**Releasors**") hereby irrevocably and unconditionally releases, acquits and forever discharges the Company and its owners, stockholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, divisions, subsidiaries, affiliates and all persons acting under or in concert with any of them (collectively the "**Releasees**") from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits , rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred), of any nature whatsoever (a "***Claim***" or "***Claims***"), that any of the

{HTW00001473; 6}1

Releasors have or may have had under the Settlement Agreement, (collectively, the "**Released Claims**"); ***provided, however***, that nothing contained in this Section 2 shall be deemed to release any of the Releasees from any other Claims that now exist or may hereafter arise in connection with (i) a breach of any of the Company's representations, warranties, covenants and agreements that are set forth in the Final Settlement Agreement or in the Notes annexed thereto, or (ii) any other matter.

3.     **Applicable Law**. This Agreement shall be construed, interpreted, governed, and enforced in accordance with the laws of the State of New York.

4.     **Binding Effect**. This Agreement shall be inure to the benefit of and shall be binding upon each of the Parties and their respective Releasors and Releasees.

5.     **Warranty**. Each party warrants that the person executing this Agreement on its behalf has the authority to do so; and that the matters being released pursuant to this Agreement have not been assigned or otherwise transferred to any other person or entity.

6.     **Acknowledgement of Terms**. The Parties have read and understand the terms of this Agreement, have consulted with their respective counsel, and understand and acknowledge the significance and consequence of each such term.

7.     **Representation by Counsel**. The Parties hereto agree that they enter into this Agreement after having received full advice from counsel of their choice with respect to this Agreement and all other matters related thereto.

8.     **Execution of Documents**. This Agreement may be executed in counterparts, and all signatures need not appear on the same copy.  All such executed copies shall together constitute the complete Agreement.

**[balance of this page intentionally left blank – signature page follow]**

**IN WITNESS WHEREOF**, the Parties have executed this Agreement to be effective this
_____day of August 2011

**Whalehaven Capital Fund, Ltd.**                    **Alpha Capital Anstalt**


By:_____        By:_____
    **Name:**                                                      **Name:**
    **Title:**                                                        **Title:**


STATE OF NEW YORK                    )
                                   )
COUNTY OF NEW YORK               )

The foregoing instrument was subscribed and sworn before me this____day of August, 2011, by_____, who personally appeared before me, and who is personally known to me or who stated that he is the _____ of Whalehaven Capital Fund, Ltd. and produced _____as identification, and who acknowledged that he signed the instrument voluntarily for the purpose expressed in it.


_____
Signature of Notary
_____
Printed Name of Notary
My commission expires:

STATE OF NEW YORK                    )
                                   )
COUNTY OF NEW YORK               )

The foregoing instrument was subscribed and sworn before me this____day of August, 2011, by_____, who personally appeared before me, and who is personally known to me or who stated that he is the _____ of Alpha Capital Anstalt and produced _____as identification, and who acknowledged that he signed the instrument voluntarily for the purpose expressed in it.


_____
Signature of Notary

_____
Printed Name of Notary
My commission expires_____

**RADIENT PHARMACEUTICAL CORPORATION**

By:_____
        Name:
        Title:

STATE OF CALIFORNIA     )
                             )
COUNTY OF LOS ANGELES )

The foregoing instrument was subscribed and sworn before me this____day of August, 2011, by_____, who personally appeared before me, and who is personally known to me or who stated that he is the _____ of Radient Pharmaceutical Corporation and produced _____as identification, and who acknowledged that he signed the instrument voluntarily for the purpose expressed in it.

_____
Signature of Notary
_____
Printed Name of Notary
My commission expires_____